## THE STROMA.[1]

### McCALDIN et al. v. THE STROMA.

(District Court, S. D. New York. February 26, 1890.)

MARITIME LIENS—SUPPLIES—LIABILITY OF CHARTERERS—NOTICE TO LIBELANTS.

The charter of the British steam-ship S. provided that the charterer was to provide and pay for all coal, oil, etc. Libelants received by telephone an order for coal for the vessel, which order they understood to come from the former agents of the ship, though in fact it did not come from them, nor from the master. The master was not previously known to the libelants, nor had they previously furnished coal to the vessel. They had previously done business for the charterer, and they knew at this time that he "had something to do with the S." The charterer introduced the master to the libelants, and gave directions about the vessel. The master also testified that he informed libelants' agent that the charterer was to be responsible for charges, though this notice was denied. No evidence was given to show that the charterer intended to charge the ship. Held, on libel against the vessel for the value of the supplies, that libelants had sufficient notice that the charterer was to pay the bills, and, as nothing showed any implied assent of the owners to the binding of the ship, the libel should be dismissed.

In Admiralty. Libel for supplies.

Hobbs & Gifford, for libelants.

Seward, Da Costa & Guthrie, for claimant.

BROWN, J. On August 29, 1888, the libelants furnished coal to the steamer Stroma at pier 37, East river. They towed her, two days before, to that pier from the Erie basin; and on September 2d they towed her to sea. Their bill of $673.50 not being paid, they libeled the steamer therefor on her return to port. The Stroma belonged to English owners, who had chartered her for a year to one Capt. Brown, commencing from the time of her discharge at the Erie basin. By the terms of the charter the master and chief engineer were appointed by the owners, but they were to be paid by the charterer, who was also to "provide and pay for all coal, oil," etc. The Stroma had been previously in this port. Her agents here, when she was run by the owner, had been Austin, Baldwin & Co. Neither they nor Capt. McFarlane, of the Stroma, had any previous acquaintance with the charterer, Capt. Brown. Capt. McFarlane was not previously acquainted with the libelants, nor had the latter previously furnished coal or towage service to the Stroma; but they had been acquainted with Capt. Brown, and had dealt with him during two or three years previous. Mr. James McCaldin testifies that he received the order by telephone about August 27th to tow the Stroma from Erie basin to pier 37, and then to send a boat-load of coal alongside; that, on asking from whom the order came, he got answer, "Austin-Baldwin," but did not recognize the voice; that, within 15 or 20 minutes afterwards, the master, Capt. McFarlane, came into the office about having the Stroma towed; that he then told the captain that he had received an order for coal, and the captain answered: "Yes; are

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

you going to send it up to-night?" The captain testifies positively, however, that he gave no order for the coal; and so do the persons having charge of that business connected with Austin, Baldwin & Co. Upon the testimony, I must find, as a fact, that the coal was not ordered by the master, or by Austin, Baldwin & Co.; and that the supposed answer received by the telephone was either a fraud, or a mistake by Mr. McCaldin. It is immaterial which it was, so far as concerns the liability of the ship. Mr. Cruikshanks, the out-of-doors agent of the libelants, had been previously acquainted with Capt. Brown, and had learned that Capt. Brown was to "have something to do with the Stroma." On the 27th August, Capt. Brown, at the Maritime Exchange, introduced Capt. McFarlane to Mr. Cruikshanks as a person who would procure a tug to remove the Stroma from the Erie basin; and Capt. McFarlane thereupon went with Mr. Cruikshanks to the libelants' office, to see about the tug, and to come over with the ship. The captain testifies that on the way he told Mr. Cruikshanks that not he, but Capt. Brown, was to be responsible for the charges, and that Brown had chartered the vessel; and that, if he could have had his own way, he would have employed his own tug people. Mr. Cruikshanks denies this conversation. As this was the first acquaintance of Capt. McFarlane with Mr. Cruikshanks or the libelants' firm, it is plain that McFarlane could not previously have ordered the coal; for he went directly with Mr. Cruikshanks to libelants' office, and the order for the tug and coal had been received by telephone a few minutes before.

The master's story is perfectly natural and consistent. Mr. Cruikshanks fails to give any rational account why he supposed the business of the ship should be taken away from Austin, Baldwin & Co., and their tug people, and be given to the libelants. He had dealt with Brown before. Brown introduced Capt. McFarlane, and gave directions; and it is impossible that Cruikshanks could suppose any other reason for this than because Brown had come into control of the ship, and was responsible for it, and therefore chose to deal with his former patrons. The circumstances were of themselves sufficient to show that the master was not acting at all on his own account, or in the ordinary course, but that Brown was directing everything. He says he knew that Brown "had something to do with the ship." This was enough to put him on inquiry. If he did not know that Brown had a charter, it was because he chose to ask no questions. Her master was selected and appointed by the owners, so that they might have a man to look after their interests. Capt. McFarlane had no possible motive to conceal or to misrepresent anything. He says he told Mr. Cruikshanks, on his way to the office, that Brown had a charter, and was to be responsible for charges, and that he (the captain) would not have left his own people, could he have had his way. I see no sufficient reason to discredit this statement. The failure, moreover, of the libelants, when the master refused to audit the bills, to apply to Austin, Baldwin & Co., either for payment, or to know how it was that the coal was ordered on their supposed telephone call, and the readiness with which they sought Brown, when the cap-

tain refused to audit the bills, confirm the belief that Mr. Cruikshanks, at least, already knew or supposed that Mr. Brown was the man who, as charterer, was to pay the bills. Upon these facts, then, I feel constrained to accept Capt. McFarlane's statements as being most credible and probable; so that, without referring to the confirmation of the same notice by the witness Elliott, who was a disinterested witness at the time of trial, and whose very circumstantial account it seems difficult to discredit, the case is like that of *Stephenson* v. *The Francis*, 21 Fed. Rep. 715; *Neill* v. *The Francis*, Id. 921; and I need not repeat what was there said of the law in such cases. Subsequent decisions are to the same effect. *The Norman*, 28 Fed. Rep. 383; *The Cumberland*, 30 Fed. Rep. 449; *The Aeronaut*, 36 Fed. Rep. 497.

A known charterer of a freighting vessel may make contracts of carriage that bind the ship, because such contracts are the very object of the charter; and the owner, in letting her for such a purpose, by necessary implication assents to the lien which the law attaches to contracts of carriage. It is "such contracts" only that Mr. Justice CURTIS refers to in the case of *The Freeman*, 18 How. 182, 189, 190. But if a passenger steamer were let for passenger service only, and freighting were forbidden in the charter, no one would contend that the charterer, not being master, could bind her by contracts of affreightment. He would be wholly without authority to do so; and a third person dealing with him would be bound by the maxim *caveat emptor* to ascertain the authority of the person with whom he dealt. Persons dealing with the *master* might rely on his *prima facie* authority to bind the ship. The maritime law vests no such *prima facie* authority in any one but the master. Contracts to bind the ship for supplies formed no part of the object of this charter. There was no implied assent of the owners thereto; and, in the face of the express provision of the charter to the contrary, there is no *status* for any imaginary or fictitious implied assent. *The Freeman, supra*, 190, 191. Had the charterers dealt with Capt. McFarlane, and on his order, without knowledge or notice of any charter, they could have held the ship. In dealing with the charterer, they took the risk of his actual authority. That question does not strictly arise here, because I must find that Mr. Cruikshanks, at least, had sufficient knowledge that Brown, as charterer, was to pay the bills; and in dealing with an owner or charterer in person, instead of the master, it is necessary, in order to hold the ship, to find that the owner or the charterer intended to pledge the credit of the ship. *The Aeronaut, supra*. Nothing of that kind appears in this case. Mr. Cruikshanks took the order of Brown, the charterer, and acted on that, without more. Brown had no authority to charge the ship for supplies, and Cruikshanks was affected with the knowledge of that fact; nor is there the slightest evidence that Brown intended to charge the ship. The libel must be dismissed, with costs.