## THE ENCHANTRESS.

### HARD et al. v. THE ENCHANTRESS.

(District Court, S. D. New York. December 4, 1893.)

1. SHIPPING—BILL OF LADING—INACCURACY OF MARKS EXCEPTED.

Upon a bill of lading excepting liability for obliteration or inaccuracy of marks, the ship is not concluded by the marks stated in the bill of lading without further proof of the actual marks shipped, and is prima facie acquitted by the delivery of all the goods taken aboard.

2. SAME—SHORT DELIVERY OF COFFEE — SURPLUS BAGS REJECTED — APPLICATION OF PROCEEDS TO CHARTERER OF SHIP AS SURETY.

Though a chartered ship is liable in rem for the nondelivery of cargo, she has a reciprocal lien on the cargo, or its proceeds, to enable her to perform her obligation to deliver the goods or pay their value; and a purchaser of rejected bags, knowing the facts, cannot apply the credit to prior claims against other vessels, to the exclusion of his claim for short delivery against the vessel carrying the same cargo. The proceeds are first applicable to a discharge of the claim against the carrying ship.

In Admiralty.    Libel by Anson W. Hard and another against the steamship Enchantress to recover for short delivery of cargo. Dismissed.

Cary & Whitridge and Mr. Butler, for libelants.
Convers & Kirlin, for claimants.

BROWN, District Judge. The libelants claim to recover the value of 35 bags of coffee, alleged to be a part of a consignment of 5,947 bags shipped on board the Enchantress at Victoria, Brazil, in September, 1892, and arriving at this port in the following November. Other coffee was on board the steamer, a part of which went to Europe upon through bills of lading. Upon the discharge of the Enchantress in this port, the tally showed a delivery of the whole number of bags called for by the bills of lading, and one more. The libelants, however, refused to accept 35 of the bags tendered them, on the ground that they did not correspond with the marks stated in the bill of lading, or that some of the marks were obliterated. They further claimed that their coffee at Victoria was put into bags of a peculiar character, used by them alone, and that there were 35 of that kind of bags short.

The proof as to the kind of bags, or the marks on the bags shipped at Victoria, is incomplete. It is not established by any competent testimony that all of the libelants' bags shipped at Victoria were of the libelants' peculiar make. Upon the discharge of the cargo, 57 bags were unclaimed or refused by the consignees, on a part of which the marks were obliterated. The claimants' testimony is to the effect that a number of those were of the peculiar Victoria bags; while the libelants' witnesses testify to the contrary. The bill of lading excepted any liability of the ship for "obliteration or inaccuracy of marks," etc.; and there are some discrepancies between the recitals of the receipts of shipment, and the bills of lading. There is no proof of the accuracy of the marks, or that the bags shipped were of the precise marks stated in the bill of lading, as the stipulation on that subject does not cover the marks. Exception as to "inaccuracy of marks," has the same effect as a similar exception in regard to weight; and the ship would, therefore, be discharged on proof of the delivery of all that was shipped. The Pietro G., 40 Fed. 497. As the evidence leaves little doubt that the Enchantress delivered all that was put on board, the proofs seem insufficient to sustain strictly the libelants' case.

Aside from this, however, there are other grounds why the libel should be dismissed. On the 14th of December, the libelants having sent to the steamship company a bill for the value of the 35 bags, Mr. Ivins, on behalf of the company, on the same day, called upon the libelants, and made a sale to them of the 57 bags from the Enchantress, and 7 others, making 64 in all. The libelants, on the following day (the 15th) resold the 64 bags, which were delivered to the vendee. On the 16th, Mr. Ivins, who, as he testifies, expected to receive cash for the sale, sent to the libelants for payment, which was declined by the libelants; and the report brought back to Mr. Ivins by his employe was, that the libelants would apply the proceeds of sale to their claim for the 35 bags short on the Enchantress, and the balance of the proceeds to prior claims of a similar kind held by them against the company. Mr. Ivins acquiesced in this,

because, as he said, he could not help himself. These prior claims amounted to $2,358.25, for alleged shortages on the cargoes of four other vessels between June and October, 1892. These claims had never been, and were not, admitted or adjusted up to the time of the failure of the company in March, 1893. The libel in this case was filed in the following month; and the libelants now claim the right to apply the proceeds of the 64 bags, amounting to about $1,200, to the prior claims, excluding therefrom the present claim against the Enchantress for the 35 bags, which amounts to $793.19.

The testimony of Mr. Ivins as to the report brought to him by his employe on December 16th, was objected to by the libelants. It was admitted, not as proof of the acts of the libelants, for which purpose it would be incompetent, as hearsay, but only as evidence of the nature of the subsequent acquiescence of Mr. Ivins, as affected by his understanding of the claim of the libelants at that time. Wholly aside from this report, however, I am quite satisfied that it was the intention of both parties that the proceeds of the 64 bags should be applied, first, to satisfy the claim against the Enchantress, and the balance to apply on the libelant's prior claim. Mr. Ivins, in effect, so testifies repeatedly; and the correspondence indicates that understanding. On the 16th of December, the same day on which payment was requested by Mr. Ivins, the libelant sent to the steamship company a memorandum, headed as follows: "Below we hand you memorandum of our unpaid claims against you." This was followed by a statement of the four prior claims, but no claim against the Enchantress. This shows that the libelants regarded the latter claim as practically paid; although in a letter of the same date they "return their claim against the Enchantress for the 35 bags," and dissent from the proposal of "adjustment at the cost of the merchandise." This was a question of detail, about which the parties never agreed; though the bill of lading stated that the price, in case of loss, should be the price at the port of shipment. Neither the letter nor the memorandum of the 16th makes any reference to the proceeds of the 64 bags, or gives any credit therefor. It is incapable of a strictly logical construction. While the letter alone might cast some obscurity on the intention of the libelants, I do not perceive that it weakens substantially the virtual statement of the written memorandum, that the only unpaid claims were the four prior ones named in it; and this for the reason, that on any mode of adjustment, the proceeds of the 64 bags were far more than sufficient to satisfy the claim against the Enchantress. The check which the letter meant to ask for must, therefore, have been for the balance of their claims after applying the proceeds of the 64 bags; and this is not incompatible with the statement of the memorandum.

The Enchantress was chartered by the steamship company, as was known to the libelants. The steamship company was bound to indemnify the ship and her owners against any such claim arising on bills of lading for the transportation of cargo. The ship and her owners were in the situation of a surety for the steamship company, the latter being the principal, and bound to indemnify. If

the ship was bound by a lien in rem for the delivery of the whole cargo, or to make pecuniary compensation for her defaults, she had a reciprocal lien upon the cargo, to enable her to perform that obligation; whether by a delivery of the cargo in specie, or by a payment of money, instead of the goods, for such as might be rejected. The lien was mutual. So much of the cargo as was thrown upon her hands through the refusal of the consignees to receive it, was a fund which the vessel, as surety, was entitled to have applied in discharge of her obligation to the consignees. The facts were all known to the libelants. Against this equitable right of the ship, the libelants had no legal right to apply the proceeds of this cargo upon prior claims against other vessels, to the exclusion of the Enchantress. I find no evidence that they had any such intention so to do, until the failure of the steamship company several months afterwards. No such act of appropriation is shown at the time, and what evidence there is negatives it. That it was the intention of both parties at the time to apply the proceeds pro tanto, to the extinction of the claim against the Enchantress, I have no doubt, as above stated; but whether intended or not, as the libelants knew the facts, they were disabled from lawfully applying it otherwise, to the prejudice of the Enchantress. The ordinary rule, giving the creditor a right to direct the application of the payment when the debtor does not do so, does not apply, because, first, this was not a payment; secondly, because that privilege would be incompatible with the rights of the steamship and her owners under the charter, of which the libelants had knowledge. See The Stroma, 41 Fed. 599, affirmed 3 C. C. A. 530, 53 Fed. 281.

The libel is dismissed; with costs.