### HERBST v. THE ASIATIC PRINCE.

(District Court, S. D. New York. October 18, 1899.)

1. SHIPPING—DELIVERY TO CUSTOMS OFFICERS—USAGE.

A ship's delivery of a consignment of dutiable goods to the customs authorities, being required by the law and usage of the place,—delivery to the proper party thereafter devolving on such authorities,—is a good delivery as between the shipper and carrier.

2. SAME—RIGHTS OF CONSIGNEE — APPLICATION OF PAYMENTS — BILLS OF LADING WRONGFULLY WITHHELD.

H., a commission merchant, had an agreement to buy goods for B. & Co. on their orders, and ship the same to them on their account and risk, and to allow them a credit of $5,000; all invoices to be charged in account current, and to bear interest from date of shipment; payments to be by remittances after notice of shipment; remittances to bear interest from time of receipt. *Held*, that B. & Co., having, after notice of shipment, but before arrival of the goods, sent remittances for part of the price, with notice that they were on account of such shipment, and having, after arrival of the goods, made tender and deposit of the balance of the price, were equitably entitled to delivery,—H. having no right to make application of the remittances on an old account; that the bills of lading were wrongfully withheld, and that the carrier was not liable for irregularity in delivering the goods to B. & Co. without the bills of lading.

Owen & Sturges, for libelant.
Convers & Kirlin, for claimant.

BROWN, District Judge. This libel was filed to recover $35,750 damages for the alleged nondelivery as per bills of lading of a consignment of merchandise invoiced at £6449.11.3, consisting of flour, lard, bacon and kerosene and shipped by the libelant on the steamer Asiatic Prince about December 31, 1895, "by order and for the account and risk of Belmarco & Co.," merchants, at Santos, Brazil, to whom the goods were invoiced and consigned.

Three bills of lading were issued to the libelant for the goods, reciting that they were marked "B. & C." and deliverable to *order* at Santos. The steamer arrived at Santos on February 5, 1896, and delivered all the goods, being dutiable, to the customs authorities at that port, in accordance with the local law and usage. The bills of lading indorsed in blank had been sent by the libelant on January 4th by the same steamer to the Brazilian German Bank at Santos with a sight draft on Belmarco & Co. attached for £4986.6.2, the

unpaid residue of the invoice price with instructions to the bank to collect the draft against delivery of the bills of lading to Belmarco & Co. The rest of the invoice price, viz. £1483.9.8, had been previously drawn by libelant against a letter of credit on London for £3000 received by mail from Belmarco & Co. a few days before (December 28th), which sum libelant applied upon this shipment and notified Belmarco & Co. thereof by letter sent by the same steamer, and credited it also on the debit note and invoices inclosed therein. Soon afterwards a second draft for £6494.8.4, the whole amount of the invoice price, was sent to the bank by the libelant by the European mail to be substituted in place of the first draft.

The steamer arrived at Santos on February 5th, and the first draft for £4986.6.2 was on the 6th presented for payment. Belmarco & Co., however, in ignorance of this draft having made payments by remittances during January on libelant's account expressly for this specific shipment to the amount of £6386.5.0 (including the sum drawn against his letter of credit) or within about £60 of the whole invoice price, at first refused payment of the first draft; but afterwards and on the same day, in order to obtain immediate possession of the goods, they concluded to pay that draft and notified the bank to that effect, at the same time seeking to cancel by cable to the bankers the remittances to London. Of these remittances, however, £2900 had been actually received by the libelant on and prior to January 29th; he insisted on retaining those remittances, and the cable notice of February 6th was too late to recall them. The residue of £2032.15.4, sent by mail on January 20th not having been then received in London, was afterwards recovered by Belmarco & Co. through the English courts.

The next morning, February 7th, Belmarco & Co. deposited with the bank a sufficient check to cover the first draft; but before the details of the settlement could be completed, the manager being absent and the precise rate of exchange undetermined, the second draft for £6494.8.4 was received by the bank, and delivery of the bills of lading was refused except on payment of that sum. Belmarco & Co. thereupon and on the same day, after again tendering the amount of the first draft and demanding the bills of lading, commenced judicial proceedings, and under the order of the local district court, deposited on February 7th with the Bank of Santos, for libelant's account, the first draft and an amount in Brazilian currency stated in the order to be sufficient to cover it, which under the local law operated as payment of that draft to the libelant.

Thereafter Belmarco & Co. on the production of the master's unsigned copies of the bills of lading, showing by the marks "B. & C." the identity of the goods with the descriptions in the invoices, and on proof then or later of the above circumstances to the customs authorities, were authorized by them pursuant to article 476 of the Brazilian customs regulations to pay the duties and to enter and receive possession of the goods, on filing an indemnity bond, without obtaining the libelant's bills of lading, or paying the full amount of the second draft; and this was allowed notwithstanding the protests of the bank and of Karl Valais & Co., the libelant's agents, to whom

on January 10th the business was turned over by the bank on libelant's orders by cable. These protests interrupted the discharge of the goods for a time, and caused a re-examination by the customs authorities of Belmarco & Co.'s claim, resulting in requiring the bond of indemnity as above stated, whereupon the final delivery to Belmarco & Co. seems to have been made on February 13th. For this alleged irregularity in delivery, without the use and authority of the libelant's bills of lading, and hence without his technical *order*, the ship is claimed to be liable for the whole value of the goods.

The ship is no doubt bound prima facie to deliver the goods to the holder of the bill of lading; but if they are not so delivered, she may show in defense, or in mitigation of damages, that the goods went to the true owner, and avail herself of the same defense he might have made (The Enchantress [D. C.] 58 Fed. 910; Id., 14 C. C. A. 180, 63 Fed. 272; Insurance Co. v. Ruden's Adm'r, 6 Cranch, 338); or show that they were delivered according to the laws and usages of the place of delivery, which is all the delivery required of her, and which fulfills the obligations of the bill of lading (Constable v. Steamship Co., 154 U. S. 51, 63, 16 Sup. Ct. 1062). If the bill of lading is wrongfully withheld, and the goods go to the person who is legally or equitably entitled to them, as between him and the shipper, though without the use of the bill of lading, the shipper sustains no actual damage, where there is no other outstanding interest in the goods; and his claim for a merely technical irregularity in delivering them without the bill of lading, is damnum absque injuria. In a court of admiralty, which proceeds upon equitable principles, nominal damages are not given; but, as in equity, a decree passes for the defendant in such a case, according to the substance of right. Barnett v. Luther, 1 Curt. 436, Fed. Cas. No. 1,025.

Such seems to me to be the situation of the present case in both its aspects.

1. The proof is here overwhelmingly in favor of the respondent, that by the law and usage at Santos, the delivery of all dutiable goods like these must be made by the ship to the customs authorities, as was done in this case, and cannot be made otherwise; and that the allowance of entry and the responsibility for a delivery of the goods, on payment of duties, to the proper party thereafter, devolves wholly upon the customs authorities. So completely is this the case, according to the evidence, that the ship cannot enforce her own claim to possession for collection of freight, nor retain the goods for her own lien, against the custom-house decision; but she must resort to a judicial embargo, which will be removed by a bond filed to answer for the ship's demands. Not only do numerous witnesses for the claimant, including experts, so testify, but several of the libelant's witnesses say the same thing; notably, Mr. Riviere, the chief person of Valais & Co. in charge of libelant's interests, who testifies:

"The custom house has charge of all deliveries. * * * All cargo under any conditions at Santos is delivered to the customs officers, who in turn deliver to the consignees. * * * All protection of goods is alone reserved for the custom house. * * * The ship's agent is only responsible for the complete delivery to the custom house. * * * The master can only deliver to the custom house."

In the three protests, moreover, that were filed in the libelant's behalf by Valais & Co., viz. in the custom house, and in the district court, and in the federal court, it is expressly stated that for the alleged wrong delivery "the custom-house employés and the Union were liable"; and the official certificate states that the ship is released. No legal experts were called by the libelant to contradict or qualify the ample testimony in the respondent's behalf on this point. No claim, or demand of any delivery of these goods in libelant's behalf was ever made at Santos upon the master, or upon the ship's agents, as such; nor was any protest or notice of nondelivery served upon either, as required by the bill of lading for any failure in proper delivery.

In the light of the above testimony, this is very persuasive evidence of the knowledge and understanding of the libelant's agents at Santos, that the ship was not in default, but had made all the delivery legally required of her; and that the libelant's remedies, if he had suffered any wrong, were against the customs authorities, and upon the bond filed by Belmarco & Co. in the custom house, or on the judicial deposit to his credit. This is further confirmed by the fact that notwithstanding libelant's orders to Valais & Co. to enforce his claim by attachment, no such remedy was sought, though the ship's presence at Santos gave full opportunity for an attachment against her. Delivery of goods upon a river bank in the custody of no one, is a good delivery and discharges the carrier, where such is the customary mode and place of delivery. Hutch. Carr. § 366, and note; Ang. Carr. §§ 312, 316. The above evidence seems to require a similar ruling here, as respects the ship's delivery to the custom house, without regard to the merits of Belmarco & Co.'s claims, and the delivery made by the custom house to them afterwards.

2. If, however, there is any error or mistake in the foreign testimony on the above point, the evidence seems to me clearly to show that Belmarco & Co. were equitably entitled to the possession of the goods on payment or tender of the amount actually due on them, which was much less than the first draft; and that on tender of the amount of that draft the bills of lading were wrongfully withheld.

The libelant was a commission merchant in New York. For a year previous he had been dealing as such with Belmarco & Co. in the purchase and shipment to them of goods as ordered. The agreement under which the goods were shipped, as disclosed in their correspondence, and the course of dealing when goods were desired, were for the libelant to ascertain and report at what price he could buy them, adding a commission of $2\frac{1}{2}$ per cent. for himself to make up the cost; if the price as thus made was acceptable, the final order was given, the goods were bought by the libelant in his own name, the commission of $2\frac{1}{2}$ per cent. added, and the goods shipped by him to Belmarco & Co. for their account and risk, the libelant prepaying the insurance and freight, and adding these charges in the invoice. The invoices and bills of lading were forwarded direct to Belmarco & Co., who by agreement were to be allowed by libelant a credit of £5000, and all goods were charged up in account current, bearing interest from the date of shipment. Belmarco & Co. in payment were

to remit funds to London bankers for account of the libelant after notice of shipment, either after arrival of the goods at Santos, or prior thereto during transportation, as they might desire; remittances to bear interest from time of receipt. Such remittances during transit of the goods had been customarily made, and in no prior shipment since their agreement on the above course of dealing, had any draft been drawn against delivery of the bills of lading.

The libelant testified that his credit of £5000 was to extend only up to the time when the goods were delivered at Santos, which would in effect require of Belmarco & Co. cash on delivery there, without even opportunity for inspection. That such was not the agreement, as it certainly was not the practice, seems to be decisively settled by the language of the libelant's own letter of June 4, 1895, in which after stating, as the terms of their dealings, that the invoices were to be charged in account current and bear interest from date of shipment, with interest to be credited on remittances from the date they were received, the libelant continues:

"You will remit to our London bankers as we shall indicate to you in letters which inclose documents of shipment, within 30 days from their arrival; or if you wish to make remittances before, you will send them to Union Discount Company of London."

The credit of £5000 was, therefore, to run 30 days after arrival at Santos; but this limit had been reached, in libelant's view, prior to this shipment by the Asiatic Prince about December 31, 1895.

By the libelant's account current, Belmarco & Co. were indebted to him for shipments prior to the present, in the sum of £5250.14.4. This made no account, however, of considerable offsets, which Belmarco & Co. claimed for alleged inferiority of certain flour in previous shipments, which the libelant refused to allow. In September 50,000 sacks had been ordered like a sample shipment by the Creole Prince. Subsequent shipments, in part fulfillment of this order, it was claimed, were not according to sample, in consequence of which Belmarco & Co. claimed both a deduction in price, and special damages for flour thrown back on their hands by their vendees. These differences not being adjusted, and the unpaid amount claimed to be due on former shipments being in excess of the stipulated credit of £5000, the libelant was unwilling to extend his line of credit further, and for that reason, as he testifies, after applying thereon £1483.9.8 drawn against the letter of credit, he drew a sight draft for £4986.6.2, the unpaid balance of the invoices, against the delivery of the bills of lading, so as to secure payment on delivery without an extension of credit further than had been agreed.

This course was not only justifiable, but strictly compatible with the terms of the contract between the libelant and Belmarco & Co., since the latter were not entitled to any credit on goods after their arrival at Santos beyond the limit of £5000; and as that limit had been previously reached, a draft attached to bills of lading drawn to order and indorsed in blank so as to control possession until payment, was a legitimate commercial method of restricting the credit to the agreed limit. This being the only purpose of the draft and of sending the bills of lading to the bank, all the other terms of the

contract, however, and the mode of dealing between the parties, remained applicable as before. In prior shipments the property in the goods as well as the right of possession vested in Belmarco & Co. from the time of shipment; and I should regard the general property in these goods also, being shipped under the same general course of dealing, as vesting in them from the time of shipment, subject to libelant's right of possession until payment of the price, for which purpose alone the bills of lading were made to order. The goods were all bought for Belmarco & Co.; the flour, the most important part, was shipped under an "old contract" of September previous; the kerosene was bought for them strictly on commission; all the goods were finally and definitely appropriated by libelant to his contract with Belmarco & Co., and no other destination for them was ever proposed; all were consigned to Belmarco & Co.; all were "invoiced and shipped by order and for account and risk of Belmarco & Co."; all bore interest from date of shipment; from that date, they were all, in case of loss, at Belmarco & Co.'s sole risk; they were partly paid for at the time of shipment by the libelant's own application, in accordance with his previous agreement, of £1483.9.8; and on the same basis the bills of lading were indorsed in blank with draft attached, merely for collection of the balance. Under such circumstances the mere fact that the bills of lading indorsed in blank were sent to the bank for the special purpose of keeping possession until payment of the residue of the price, would not prevent the general property from passing on shipment, subject only to libelant's right of possession till payment. Mirabita v. Bank, 3 Exch. Div. 164. The libelant testifies:

"When I put the documents in the mail the goods would belong to him."

And in his letter of January 4th he says:

"We hand you inclosed documents [debit note, invoices, etc. Ex. 49 to 62] as per statement, drawing for the balance as formerly at sight."

The debit of the goods to Belmarco & Co., the charging of interest from date of shipment, and the libelant's testimony, his letter of January 4th, and exhibits inclosed showing the invoices and shipment at Belmarco & Co.'s sole risk, indicate that the property was intended to vest on shipment, reserving only the control of possession for the purpose of securing payment.

It is not very material, however, whether the general property in the goods be deemed to have vested in Belmarco & Co. at the time of shipment or not; because, if the libelant's draft for £1483.9.8 against Belmarco & Co.'s letter of credit, as well as Belmarco & Co.'s remittances of £2000 on January 6th, and of £900 on January 10th, are entitled to stand as originally applied by them in part payment of these goods, there can be no doubt that Belmarco & Co. by these payments, made on the faith of the shipment, with the other circumstances above mentioned, acquired such a special property in these goods (Langton v. Waring, 18 C. B. [N. S.] 315), and that the contract itself was so far executed by both parties, that Belmarco & Co. had an equitable right to the completion of the contract, and to the property and possession of the goods upon their payment of the bal-

ance of the price on arrival at Santos; and that inasmuch as they obtained possession after payment, or tender and judicial deposit, of the residue of the price, even if that possession had been irregularly acquired, the libelant could not be held in law or equity to have sustained any damage, and hence is not entitled to any recovery against the ship. Had the libelant become a bankrupt after such payments by Belmarco & Co. and before the arrival of the goods at Santos, his trustee in bankruptcy could not have kept both the money and the goods; but Belmarco & Co. on taking the goods and paying or tendering the balance of the price, could have kept them as against the trustee. Langton v. Waring, 18 C. B. (N. S.) 315. The libelant's rights are no greater.

This branch of the case turns, therefore, upon the question whether the three payments made by Belmarco & Co. on account of these goods to the amount of £4383.9.8, which was actually received by the libelant with notice some time before the arrival of the goods at Santos, could be lawfully diverted and applied by the libelant upon his prior account current, as he now claims. In his support, it is urged that when these moneys were received by him, Belmarco & Co. owed no debt for these goods; and that the moneys received from them could therefore be lawfully applied by libelant to Belmarco & Co.'s prior indebtedness without regard to Belmarco & Co.'s directions as to the application of the remittances. If it were essential to rule on the question of indebtedness, I should feel constrained to find that under the contract and dealings of the parties as disclosed by the evidence before me, differing from that in the English case, an indebtedness for these goods from Belmarco & Co. to the libelant, bearing interest, did arise from the date of shipment, according to libelant's debit. But no ruling on that point is essential; because the general contract of the parties as evidenced by the libelant's letter of June 25th above quoted, provided for such advance remittances and allowance of interest thereon from date of receipt; while the draft for £1483.9.8 against the letter of credit, was subject to an additional special agreement that it was to be applied to "new shipments."

The letter of credit for £3000 on London was mailed to the libelant on November 25th for account of new shipments, as the libelant was advised by cable of that date, as appears from the libelant's letter of November 29th acknowledging the receipt of the cable, saying:

"We also thank you for the remittance which you advise in your telegram of 25th inst. and our authorization to draw for your account on the London & Hanseatic Bank against new shipments."

In this letter of December 28th he again writes his thanks for the letter of credit (then received), which he says:

"We shall use against new shipments by Asiatic Prince."

A few days afterwards on January 3d, that shipment being completed, the libelant drew £1483.9.8 upon that letter of credit, upon account of these goods; he so notified the London bankers in his letter of January 3d; so wrote to Belmarco & Co. in his letter to them of January 4th; credited it on the debit note and invoices, and on that basis drew his draft for the balance of the shipment. The applica-

tion thus made, he was bound to make by his contract; and when actually made as agreed, it became an executed contract, and incapable of change except by Belmarco & Co.'s consent.

The remittances of £2000 on January 6th and of £900 on January 10th were in conformity with the letter of June 25th. The right given to Belmarco & Co. to make remittances prior to the receipt of the goods or of the shipping documents, necessarily imports libelant's agreement to accept such payments as they are remitted, and for the accounts expressed in the remittance. Here there was a specific agreement between the parties on this very subject; and this agreement binds the libelant to abide by the application made by Belmarco & Co. of their remittances.

Both the remittances of January 6th and January 10th were particularly stated at the time of the remittance to be for account of goods by the Asiatic Prince. The libelant was also specially notified to this effect as to the £2000 by cable of January 7th, which he received on the same day; and the cable of January 10th must have conveyed to him similar knowledge as to the £900. The latter was a cable remittance received in London at once; the remittance of £2000 was received by the London bank for libelant's account on January 29th, and the libelant was notified of that fact; and he instructed the bank to retain it to his credit. These appropriations by Belmarco & Co., being in conformity with the contract, could not be altered by the libelant.

Good faith and fair dealing, moreover, required the two latter remittances to be applied on the first draft, because they were evidently made by Belmarco & Co. on the faith of this shipment. The libelant was cabling to them for funds, but suppressing in his cables the fact of the draft, and thus inducing additional remittances from them by practising upon their ignorance. On December 26th he cabled,

"We are executing your orders, but would thank you for assisting us with bank credit £7000."

This was evidently a request for remittances on account of new shipments; Belmarco & Co. having complied with this request, the libelant is estopped from any different application.

On December 28th he wrote,

"Our shipments by Asiatic Prince will amount to more than £7000."

And on January 3d he cabled,

"We have executed all your orders except 5000" (bags of flour).

On January 6th he again cabled for remittances, and also on the 7th, the same day that he received express notice of the remittance of £2000 on account of the shipments by the Asiatic Prince. That Belmarco & Co. were acting in good faith in respect to this shipment, and not with any idea of obtaining possession of the goods and delaying or refusing remittances, is conclusively proved by the fact above stated of their remittances within about £60 of the invoice price, three weeks before the arrival of the goods.

Belmarco & Co. were therefore entitled to have their remittances to the amount of £4383.9.8 stand as applied by them against these goods. On arrival at Santos, less than one-third the invoice price

remained owing; the tender and judicial deposit by Belmarco & Co. to libelant's credit were £2900 in excess of the amount owing for the goods, and even if the draft for £1483.9.8 were applied on the old account, the tender and deposit would still be largely in excess of the amount due.

As Belmarco & Co. were therefore equitably entitled to the goods on tender of more than the whole amount due, and as the libelant has sustained no damage in the eye of the law from their subsequently obtaining possession, the decree should be for the respondent with costs.