## THE ASIATIC PRINCE.

(Circuit Court of Appeals, Second Circuit. April 3, 1901.)

### No. 51.

1. SHIPPING—DELIVERY OF CARGO—LOCAL LAW REQUIRING DELIVERY TO CUSTOMS OFFICERS.

Where, by the local law and usage, dutiable goods imported are required to be delivered to the customs authorities, who assume the responsibility of thereafter making delivery to the proper person on payment of the duty, a delivery by the ship to such authorities is a good delivery as between carrier and shipper.

2. PAYMENTS—APPLICATION BY AGREEMENT—RIGHT OF CREDITOR TO CHANGE.

Where a creditor has applied a payment to a particular indebtedness, and notified the debtor, who acquiesces therein, the application becomes a finality, and the creditor cannot thereafter change it without the debtor's consent.

3. SHIPPING—SUIT FOR WRONGFUL DELIVERY OF CARGO—DEFENSES.

Libelant shipped a consignment of goods to a customer at a Brazilian port, taking bills of lading to his own order. He applied a credit in his hands upon the purchase price, and attached the bills to a draft for the balance, and forwarded the same for collection' to a bank by the same ship, and also a letter of advice to the purchaser. The latter acquiesced in the payment applied, but, having made further remittances to apply on such consignment in ignorance of the draft, at first objected to its payment, but later deposited its amount with the bank. Before the bills had been delivered to him, however, the bank received from libelant a second draft for the full value of the goods to be substituted for the first, libelant stating that he had changed the partial credit first given. On the refusal of the bank to deliver the bills of lading except on payment of the second draft, the purchaser commenced judicial proceedings, in which, under an order of court, he obtained a deposit of the first draft, and deposited an amount sufficient for its payment, and upon proof of such facts the goods were delivered to him without the production of the bills of lading. His prior remittances, which were specifically stated to be on account of such consignment, and which were received by libelant, together with the amount first credited thereon by libelant, reduced the amount still due thereon far below that deposited. Held, that the purchaser was entitled to have such credits all applied upon the price of the goods, and hence was the equitable owner, and that the ship could not be held liable for their wrongful delivery.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the district court, Southern district of New York (97 Fed. 343), dismissing a libel to recover damages for the alleged nondelivery of certain merchandise shipped on the Asiatic Prince from New York in December, 1895, and January, 1896, to the port of Santos, in Brazil.

John L. Lewis, for appellant.
J. Parker Kirlin, for appellee.

Before WALLACE and LACOMBE, Circuit Judges, and THOMAS, District Judge.

LACOMBE, Circuit Judge. The merchandise consisted of flour, kerosene, bacon, and lard, of the invoiced price of £6,499.1.3, which had been ordered by Belmarco & Co., merchants of Santos, who were also agents of the Prince Line—of which the Asiatic Prince was one —at that port. The plaintiff and Belmarco & Co. had had many business transactions prior to the one in question, and as a result of them the latter firm was, as libelant claims, indebted to him to a considerable amount. Bills of lading for this merchandise were issued to the libelant, reciting that the goods were to be delivered at Santos "unto order, or his or their assigns." A letter of credit on London bankers to the credit of Belmarco & Co. was at the time available, and against that libelant drew for £1,483.9.8, credited and applied that amount to this shipment, and drew a draft on Belmarco & Co. for the balance, £4,965.11.7, with interest and banker's commission; in all, £4,986.6.2. Libelant attached indorsed copies of the bills of lading to this draft, and forwarded them to a Brazilian bank at Santos, with instructions to deliver to Belmarco & Co. upon payment of the attached draft. These documents went forward in the mail that was carried by the same steamer, together with a letter advising Belmarco of the application of the London credit and of the draft for balance of price of shipment. The steamer reached Santos on February 5th. On February 6th, in the afternoon, the bank at Santos presented the draft to Belmarco. The manager of the bank, libelant's witness, testified that under the Brazilian Commercial Code and the commercial usage in Santos payment of a sight draft may be delayed for 24 hours if the holder finds it convenient, and that in this case the bank did not expect Belmarco to write any acceptance on the draft, nor to pay it before the expiration of the customary 24 hours. Belmarco, who, as will be seen hereafter, had meantime made remittances on account of this merchandise, at first refused payment, but subsequently, on the same day, reconsidered, and on the next morning, before the bank opened, deposited with one of the officers of the bank a check sufficient to cover the amount. It seems, however, that a few days after the sailing of the Asiatic Prince libelant changed his mind about applying the London credit to this shipment, and drew a second draft for the full amount of the invoice price, with interest and banker's commission, £6,494.8.4, which he sent to the bank at Santos to be substituted for the first draft. Although the cable was being constantly used by both parties, libelant, for some reason known only to himself, failed to advise Belmarco & Co. before they received his letter stating application of the draft of £1,483.9.8 to this shipment that he had reconsidered such application, and had chosen to apply it to the old indebtedness. This second draft arrived while discussion was going on between the manager of the bank and the representative of Belmarco & Co. as to the rate of exchange, the question being how much the bank should refund with the bills of lading, the amount of the check being in excess of what either party contended was the proper rate of exchange. The bank thereupon refused to deliver over the bills of lading except on payment of the second draft. Belmarco thereupon commenced judicial proceedings, and under order of the local district court deposited on February 7th with

the Bank of Santos, for libelant's account, the first draft and an amount in Brazilian currency stated in the order to be sufficient to cover it. Entry of the goods was made on the ship's copies bills of lading unsigned and stamped "Nonnegotiable." Proof of all the circumstances above set forth was made to the customs authorities. A bond of indemnity was required from Belmarco, and the goods passed into his hands, notwithstanding the protests of the bank and of Karl Valais & Co., the libelant's agents, to whom, on February 10th, the business was turned over in compliance with instructions by cable. The district judge held that delivery had been made by the vessel according to the provisions of the local law, and that by reason of the application of the £1,483.9.8, and two other remittances of £2,000 and £900, respectively, to cover this shipment, Belmarco had acquired a special property in the goods, and had a right to the completion of the contract under which they were shipped upon payment of the balance of the price on arrival at Santos; and that, as such balance, or more, had actually been tendered, and judicially deposited with the draft as payment after tender, Belmarco & Co. were the true owners, and the ship absolved from all responsibility, because it delivered to the person then rightfully entitled to it. As to the first of these propositions the district judge held:

"The proof is here overwhelmingly in favor of the respondent that by the law and usage of Santos the delivery of all dutiable goods like these must be made by the ship to the customs authorities, as was done in this case, and cannot be made otherwise, and that the allowance of entry and responsibility for a delivery of the goods on payment of duties to the proper person thereafter devolves wholly upon the customs authorities."

Such a system, in which the customs authorities assume the ship's responsibilities as to making true delivery, is contrary to the system prevailing in other ports. Nevertheless it is not incredible that a government may undertake such functions. Whether or not it is the law and usage in Santos is a question of fact, the burden of proving which is on the party asserting its existence. The law of a foreign country and its commercial usages are proved here by calling its lawyers and merchants and interrogating them. That has been done in this case, with a result which certainly warrants the conclusion that the proof is overwhelmingly the one way. It is true that as to the law of Brazil the only witness called by claimant was a young lawyer, but his statements are direct, positive, and reiterated to the effect that the customs authorities require delivery to them, and themselves make delivery to whomever has the right to receive; and there is no reason apparent why his statements should not be accepted, especially when the great weight of mercantile testimony is to the same effect. There was abundant opportunity to take the testimony of some other lawyer in the district court if the statements of claimant's witness were inaccurate, and to make application here to take further proofs; but libelant has contented himself with printing copious excerpts from the statute law of Brazil, which he insists do not sustain the witness' statements. As an example of the argument employed, the witness testified, "The custom-house inspector alone decides any right to entry and delivery," and referred to article 477 of

108 F.—19

the Consolidated Custom-House Laws. Appellant prints this article, and says "it makes no reference to delivery." Apparently that is so, but it does provide for making proof to the collector by legitimate documents of a party's right to receive imported merchandise. Such a method of criticizing the testimony of a foreign lawyer as to the law which prevails in his country is unpersuasive. There is much more than the text of a statutory enactment to be considered. Departmental regulations, administrative construction, judicial exposition, are often quite as important. The text of the act of congress of February 26, 1885, might well convey to a jurist in some foreign country a different meaning from that which it conveys to a lawyer here who is familiar with Holy Trinity Church v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226. We are of opinion, therefore, that the new proofs contain nothing which should require any modification of the conclusion of the district court as to the ship's delivery of the merchandise to the custom house being sufficient to discharge her obligation.

The decision may be sustained, however, on another ground, more satisfactory, perhaps, because untechnical. We concur with the district judge in the conclusion that by reason of Belmarco's payments on account of this shipment, and the tender and judicial deposit which he made, his firm was rightfully entitled to delivery, and the ship not liable for damages because of such delivery. As has been stated above, libelant drew for £1,483.9.8 against a London credit of Belmarco & Co., and in his letter of January 4th wrote to that firm:

"We have used of the letter of credit No. 9 of Mess. Robertson & Co. by our draft £1,483.9.8 at 90 days' sight, order of London & Hanseatic Bank, Limited, and credited it to you under usual reserve, and applied it to the present shipment. We recommend to you our draft, with documents attached, No. 10,356, £4,986.6.2 [balance invoice price of this shipment], at sight, order Brazilian Bank, to your prompt protection."

The draft for £1,483.9.8 was paid in London, and forwarded by the bankers to Belmarco, who paid its amount to the persons advancing the credit to February 1st. On February 6th he received the letter notifying him of Herbst's application of the proceeds to this shipment, and was presented with draft for the balance, for which, as he testifies, he tendered a sufficient check. Here we have an express application by the creditor, of which application the debtor is informed, and in which he acquiesces, before he receives any notification that the creditor desires to alter the application. Such an application cannot thereafter be changed without the consent of both parties. On January 6th Belmarco sent to libelant drafts on London bank aggregating £2,000, which libelant subsequently received and collected. The next day—January 7th—Belmarco telegraphed libelant (the telegram was duly received): "On account of your shipment per S. S. Asiatic Prince, remittance sent by mail London, &c., Bank yesterday morning £2,000." In the letter to the London, etc., Bank he writes, "Put the above total to the credit of Herbst Bros., of New York, against their shipment of 2,000 kegs lard and 600 barrels bacon on the S. S. Asiatic Prince." Here we have an express application made by the debtor, of which application he promptly notifies the creditor.

It is familiar law that such application must stand. It makes no difference that he is indebted to his creditor on other accounts, nor that his creditor, when he sent forward the goods on account of which the debtor makes the payment, expected that old indebtedness would be first paid, nor that he had good reason to suppose that past differences between them would be arbitrated, nor that the creditor had telegraphed asking for remittance on general account, nor that the creditor objects to the debtor's application, and insists on making a different one. As was said by Redfield, J., in Boutwell v. Mason, 12 Vt. 608, this absolute right of application in the debtor "results from one of the most obvious principles of human action,—that a free agent may annex such conditions to an offer as he sees fit, and he who accepts the offer takes it subject to those conditions." It is, therefore, unnecessary to go over the voluminous history of the past transactions, with its disputes as to quality of flour, as to modes of payment, etc., in order to ascertain which of the disputants is nearer right. There is nothing in it all which could in any way deprive Belmarco of his undoubted legal right when he sent his creditor £2,000 on January 6th to designate to which account it was to be applied. On January 7th libelant telegraphed Belmarco, "Remit to W. H. Cole & Co. £900 overdue," to which the latter replied: "Your telegram to hand. We cannot conform to contents." On January 8th libelant again telegraphed, "Remit by telegraph. Remit to W. H. Cole & Co.," —to which Belmarco replied on the 9th: "New London & Brazilian Bank, Ltd.: Remit p. telegraph £900. W. H. Cole & Co." Belmarco testifies that he applied this payment to the shipment by Asiatic Prince, and says that the word "new" in this telegram is an indication that the remittance is on the new account. This seems to be a reasonable interpretation in view of the circumstance that it appears from the record that there is a London & Brazilian Bank, but does not appear that there is any such concern as a New London & Brazilian Bank. Belmarco's statement is confirmed by his letter of the same day as the telegram to Cole & Co., in which he writes: "We beg to advise you having this day sent you a telegraphic order through the London & Brazilian Bank, Ltd., for the sum of £900, which amount kindly place to the credit of Messrs. Herbst Bros., of New York, for account of their shipment to us per the S. S. Asiatic Prince." We have here another application by the debtor of his payment of £900 to this particular shipment. When the first draft, therefore, arrived at Santos, and was presented to Belmarco, he had paid out money on account of this shipment of £6,449.1.3 to the amount of £4,383.9.8. The first draft, therefore, was largely in excess of the amount remaining due. The mail that brought the first draft brought also, as we have seen, the letter of advice from libelant stating that he had applied the £1,483.9.8 to shipment per Asiatic Prince. Acquiescence in such application by the debtor, Belmarco, would make it a finality. He testifies that he did so acquiesce, and we see no good reason for rejecting this testimony. As to the deposit of check sufficient to meet the draft of £4,986.6.2 with the Santos Bank early in the morning of February 7th, the only testimony is that of Belmarco and his partner, Lundin. There is in the record a written statement,

signed by the partners in the firm (a depositor in the bank) which furnished the check that was deposited, corroborating this testimony, but it is not sworn, is in no sense evidence, and needlessly incumbers the record. But, if the testimony of Belmarco and Lundin as to an early deposit be rejected, the situation is not changed. The bank officers themselves testify that from the moment of presentation of the first draft Belmarco's contention was that he had made remittances which had reduced the amount he owed on this shipment below the amount of such draft; and that on February 7th, after being informed of the arrival of the second draft, he offered to pay the first draft. Tender of the proper amount was undoubtedly made, and judicial deposit completed on that day. Libelant contends that the original refusal to pay the first draft operated to leave him free to change the application of the £1,483.9.8 to current account, because by so refusing Belmarco failed to acquiesce in the original application. If there had been no other payments, so that the amount of the first draft was still due on this shipment, there might be some force in this contention. But, if it be assumed that Belmarco & Co. had paid £2,900 more on this shipment (and, as we have seen above, there can be no doubt that they made such payment when they applied the £2,000 and £900 drafts thereto), their refusal to pay the whole amount of the first draft as a condition of receiving the bills of lading is no indication that they refused to acquiesce in the first application of the £1,483.9.8. On the contrary, their conduct at the time, insisting as they did that the amount still due on the shipment was very much less than the first draft, fully corroborates Belmarco's testimony that he acquiesced in libelant's original application of the £1,483.9.8 as soon as he heard of it, and never consented to any change. We entirely concur in the conclusions of the district judge, and on all other points arising in the case deem it unnecessary to add anything to his discussion thereof. The decree of the district court is affirmed, with costs.