CHAS. A. WEAVER et al. v. A. R. OGLE et al.

Eastern Section. May 22, 1926.

No petition for Certiorari was filed.

1. **Payment. Party is not bound by custom in applying credit.**
   The fact that a party as a rule applies payment made on his accounts in a certain manner cannot bind him and keep him from departing from this rule and apply a payment as he sees fit.

2. **Payment. Payment made to a subcontractor with money which he knows comes from a certain source should be applied to the debt of the party unless there is an understanding that it may be applied elsewhere.**
   Where a subcontractor was paid money by the general contractor and he knew that the money came from a party for whom he was building a house, held that unless the subcontractor had an understanding that the money might be applied elsewhere, that it should be applied to the account of this party's house.

3. **Payment. If debtor does not designate account payment is to be applied to, payee may apply it as he pleases.**
   The general rule is this state, in respect to the appropriation of payments is, that a debtor owing different debts to the same person has a right to apply the payment at the time when made to either debt, and if he fails to

do so, and the payment be general, the creditor may apply it, and where no appropriation is made by either party the law will apply it according to the intrinsic justice and equity of the case.

4. **Payment. When payee once applies payment to a certain debt it cannot be changed without the consent of all parties concernea.**

When a payment is made and there is no direction as to its application, the payee may apply it to any debt of the debtor that he may see fit, but having once made his election and applied it, he can not then transfer it without the consent of all interested parties.

5. **Payment. Evidence. Subcontractor held not entitled to transfer a payment after credit was once made on an account.**

In an action by a subcontractor to recover for work and labor done, and have the same declared a lien against a house, where it appeared that upon the general contractor making a payment to the subcontractor he had credited the amount on the account, and had later transferred it to another account, held that having once credited the account, he could not transfer the credit without the consent of the parties and the subcontractor was therefore not entitled to a lien against the property.

Appeal from Chancery Court, Knox County; Hon. Chas. Hays Brown, Chancellor.

Modified and affirmed.

Lee, Price, McDermott and Meek, of Knoxville, for appellant.

Henry Hudson, of Knoxville, for appellee.

SNODGRASS, J. Appellants, the defendants, make a fair statement of the case in their brief, as follows:

"The original bill was filed in this cause by Charles A. Weaver and A. J. Dunn as a co-partnership. It alleged that the principal defendants, A. R. and S. M. Ogle, doing business under the name of Ogle Brothers, as General Building Contractors, had been employed by the defendant, J. Harry Price and wife by special contract to build a dwelling house on a certain lot in Knox county, Tennessee, and that said Ogle Brothers had in turn employed the complainants to furnish the brick, sand, lime, cement, etc., and to do all of the brick work on said building, and that the complainants did said work under said contract, and that there is a balance due to the complainant for said work of eight hundred and ninety dollars and fifty-eight cents, ($890.58) for which they are entitled to a money judgment recovery, and, as it was alleged, to a lien upon the property of Mr. and Mrs. Price, which was duly described in the original bill. It was further alleged that the complainants had given Mr. and Mrs. Price, owners of said property, a written notice that they claimed a lien, within the time prescribed by the statutes of Tennessee, and had filed a copy of said lien in the office of the Register of Deeds for Knox county, Tennessee.

The principal defendants, Ogle Brothers, filed an answer to said bill in which they admitted the several contracts, but they denied

that the sum of eight hundred and ninety dollars and fifty-eight cents ($890.58) was due to Weaver and Dunn upon said contract. On the contrary they alleged that on October 3, 1914, they, the Ogle Brothers, had paid to the complainants the sum of five hundred dollars ($500) upon the claim of Weaver and Dunn, for which sum credit did not appear upon· the statement filed with the original bill by Weaver and Dunn, and that they, Ogle Brothers, directed at the time of making such payment, that this payment should be applied and credited upon the work or material done and furnished upon the J. Harry Price house, or in other words, to use contractors' parlance, "upon the Price job." And it was alleged that said credit of five hundred dollars ($500) had in fact been entered upon the Price job, but that at a later period, as these defendants were informed, the complainants, "for some reason known to themselves, but unknown to these respondents, endeavored to remove and erase this credit of and covering this payment of five hundred dollars ($500) from the Price job, and to apply this payment to other and different amounts alleged to be due to complainants from said Ogle Brothers, upon other jobs." It was thereupon further averred by Ogle Brothers that the utmost sum due from them to Weaver and Dunn upon the Price Job or for which a lien could be asserted, was the sum of three hundred and ninety dollars and fifty-eight cents ($390.58). Ogle Brothers further denied that the necessary steps had been taken by the complainants to give the requisite notice for and to set up and establish the asserted lien upon the Price property.

The property owners, J. Harry Price and wife, also filed their answer to said bill, in which answer they denied in turn that the necessary steps as prescribed by the Tennessee statutes had been taken by the complainants to give the requisite notice for and to establish the asserted lien.

They further averred, as had the principal defendants, that the sum of five hundred dollars ($500) had been paid by the Ogle Brothers to Weaver and Dunn upon the Price job, and that this sum had been credited to the Price job by Weaver and Dunn, and that, as these respondents were informed, at a later period, and without the consent of either Ogle Brothers or Mr. and Mrs. Price, the said Weaver and Dunn had for some unknown reason assumed to take said credit of five hundred dollars ($500) away from the Price job and to enter it as a credit on some other job in which Mr. and Mrs. Price were not interested. It was specifically asserted that this was done without the knowledge or consent of either the principal contractors, Ogle Brothers, or the property owners, Mr. and Mrs. Price, and that said transfer "had never been accepted, approved or ratified by Ogle Brothers" nor by Mr. and Mrs. Price. It

was further asserted that this sum of five hundred dollars ($500) was gotten by Ogle Brothers from Mr. Price for the purpose of being paid to Weaver and Dunn and that the complainants, Weaver and Dunn, knew that fact, and knew when they received said payment of five hundred dollars ($500) it was to be and was in fact a credit upon the amount that Mr. and Mrs. Price owed to Ogle Brothers, and upon the amount that Ogle Brothers owed to Weaver and Dunn upon the Price job. It was asserted that upon such payment being made and credits given, as aforesaid, the rights of the parties became absolutely fixed and determined, and no right remained in Weaver and Dunn to change such credit or to remove said amount from the account to which it had been credited, and that the only amount remaining due to Weaver and Dunn from Ogle Brothers upon the Price job was the balance of three hundred and ninety dollars and fifty-eight cents ($390.58), which would remain and did remain after retaining said credit of five hundred dollars ($500) upon said account.

The property owners, Mr. and Mrs. Price, accordingly tendered into court said sum of three hundred and ninety dollars and fifty-eight cents ($390.58) with interest and costs down to said date, and upon said tender being made and paid into the Registry of the court, they asserted that their full obligation and liability had terminated, and that there was no right of lien or claim or demand in favor of the complainants, Weaver and Dunn, upon the Price job.

There was then prepared, executed and entered of record a stipulation with regard to the interest in this matter of the American Surety Company of New York. Said stipulation appears on page 21 of the transcript. It recited that said American Surety Company had signed as surety for Ogle Brothers a contractor's bond running to Mr. and Mrs. Price for the construction of the buildings upon said property, in the penal sum of thirty-five hundred dollars ($3500). It recited all of the facts as set forth in the pleadings as above shown to the Court, excepting that the amount claimed by Weaver and Dunn to be due was recited as eight hundred and eighty-nine dollars and eighty-three cents ($889.83) in place of eight hundred and ninety dollars and fifty-eight cents ($890.58). It recited in substance that the American Surety Company desired to make good its suretyship, and, accordingly, it entered its appearance as a party defendant to the case upon the terms and conditions that it should have the right to make any and all defenses that either Ogle Brothers or Mr. and Mrs. Price might make, either in its own name or in their name. It stepped into the place and shoes of Mr. and Mrs. Price. It was further provided in and by said stipulation that if upon final hearing it should be found and determined that there was a balance due to the complainants upon

the J. Harry Price job of five hundred dollars ($500) after apply-
ing the amount tendered into court, judgment should be rendered
against said American Surety Company for said amount with in-
terest from March 18, 1915, and such portion of the costs of the
cause as the court may adjudge should be paid by the defendants.
Thereupon, the American Surety Company through its counsel
both in its own name and in the name of Mr. and Mrs. Price, as-
sumed charge and control of this case.''

It was conceded by the complainants that a fair statement of
the case was made, except it was insisted there should be added to
it a clause from the stipulation as follows: ''That it (referring to
the American Surety Company), shall have and shall be protected in
the right to make any and every defense whatsoever to this pro-
ceeding, both in this court and in any appellate courts, which said
defendants, J. Harry Price and wife, can or should make; and said
defenses may be made either in the name of the American Surety
Company or in the name of J. Harry Price and Minnie McClung
Price, except alone any defense as to the regularity of the process and
attachment herein, which it is now stipulated are valid and binding.''

The foregoing clause was made a part of the stipulation, and
is added as a part of the statement of the case.

The case was then heard before the court, who rendered the fol-
lowing decree:

''This cause came on to be heard before the Honorable Chas.
Hays Brown, Chancellor, upon the original attachment bill,
the answer of the defendants, the depositions on file and ex-
hibits thereto, and the entry of appearance as defendant of the
American Surety Company of New York, and the stipulation
entered into between the American Surety Company of New
York and the complainants and defendants (by the terms had
executed a bond for Ogle Brothers, contractors, to defendants),
J. Harry Price and wife, Minnie McClung Price, in the penal
sum of $3500 conditioned upon said defendants, Ogle Brothers
saving the obligees harmless from any and all loss, or damage
by reason of said contract and from any and all liens for ma-
terials furnished and work done in the erection of said build-
ing under and by virtue of said contract, which may be fixed
upon said property as a result of said contract and said con-
tractors' operation thereunder.

''From all of which it appears to the court that the defend-
ants, A. R. and S. M. Ogle are indebted to complainants, Chas.
A. Weaver and Alva J. Dunn, in the sum of $500 and interest
thereon from the 18th day of March, 1915, to the 18th day of
March, 1925, in the sum of $300 making a total of principal
and interest in the sum of $800 that to secure the payment of

said sum the complainants are entitled to a lien on the property of the defendants, J. Harry Price and wife, described as follows:

" 'Situate in the 8th (formerly the 12th) Civil District of Knox county, Tennessee, and thus described:

" 'Beginning at an iron pin on the South side of Kingston Pike and 137 feet from the east side of Woodland road; thence South 24 deg. 20" east 505 feet more or less to an iron pin on the North side of Woodland road; thence South 82.20 east with the North side of Woodland road 31 feet to an iron pin; thence North 60.40 east 73 feet to an iron pin; thence North 24.20 west 519 feet more or less to an iron pin on the South side of Kingston Pike; thence westwardly with the south side of Kingston Pike 100 feet to the beginning. Being the same property conveyed to J. Harry Price and wife Minnie McClung Price on the 11th day of April, 1914, by the Knoxville Real Estate Company by deed of record in the Register's office of Knox county, Tennessee, in Book of Deeds 107 page 332, to which reference is made.' "

It further appearing, however, to the court under the terms of the aforesaid stipulation with the defendant, American Surety Company of New York, that it has been agreed between all parties to this suit that no lien shall be decreed and enforced by sale of the above described property but if at final hearing the court should be of opinion that complainants are entitled to a lien upon the property of defendants, Price and wife, that judgment for the amount for which said lien would otherwise be decreed and enforced, shall be rendered against and will be paid by defendant, the American Surety Company of New York, the amount of said judgment not to exceed the sum of $500 and interest thereon from March 18, 1915.

It is therefore ordered, adjudged and decreed by the court that the complainants, Chas. A. Weaver and Alva J. Dunn, have and recover of defendants, A. R. and S. M. Ogle and the American Surety Company of New York, the sum of $500 and interest thereon from March 18, 1915, to March 18, 1925, in the sum of $300 making a total of $800 and all costs of this cause, for which execution may issue.

The defendants all excepted to the foregoing decree, prayed for, obtained and perfected an appeal to this court, and have assigned errors as follows:

"1. The court erred in finding and adjudging that Ogle Brothers were indebted to Weaver and Dunn in the sum of five hundred dollars ($500) or in any other sum upon the J. Harry Price job of work, or contract.

"2. The court erred in rendering a decree against Ogle Brothers and the American Surety Company of New York for

the sum of five hundred dollars ($500) and the interest thereon.

"3. The court erred in finding and decreeing that the complainants are entitled to a lien on the property of the defendants J. Harry Price and wife for said sum of five hundred dollars ($500) and interest or any other sum of money.

"4. The court erred in finding and holding that the complainants Weaver and Dunn were justified or entitled to transfer the sum of five hundred dollars ($500) paid on October 3, 1914, and credited by them on that date to the J. Harry Price contract, out of said account, and credit it to some other account without the consent of Mr. and Mrs. Price.

"5. The court erred in finding and holding that the complainants Weaver and Dunn were justified or entitled to transfer the sum of five hundred dollars ($500) paid on October 3, 1914, and credited by them on that date to the J. Harry Price contract, out of said account, and credit it to some other account without the consent of the American Surety Company, surety.

"6. The court erred in finding and holding that the complainants Weaver and Dunn were justified or entitled to transfer the sum of five hundred dollars ($500) paid on October 3, 1914, and credited by them on that date to the J. Harry Price contract, out of said account, and credit it to some other account without the consent of the defendants, Ogle Brothers."

We disagree upon the record with the conclusions of the Chancellor. We think the bill should have been dismissed insofar as it sought to subject the Price property, or to enforce any lien thereon, or as rendering any decree against the surety in lieu thereof. It is our opinion that after the filing of the agreement by which the American Surety Company became a party the contest as to the lien, provided it be determined that the transfer of the credit of $500 from the Price account was authorized, was virtually abandoned.

However, we think the complainants were, and are, entitled to a lien, provided it be determined that the transfer of said credit was authorized and the amount claimed now a proper charge against the Price property.

Complainants were sub-contractors under Ogle Brothers in the work done on the house, etc., a part of which, in the building of the garage, came in as extras under the contract.

Section 3540, Shannon's Code, gives the lien, provided that "within thirty days after the building is completed, or the contract of such laborer, mechanic or workman shall expire, or be discharged, he or they shall notify in writing the owner of the property on which the building or improvement is being made, or his agent

or attorney if he reside out of the county, that said lien is claimed, and said lien shall continue for the space of ninety days from the date of said notice in favor of such sub-contractor, mechanic or laborer.''

Complainant A. J. Dunn shows in his deposition that a garage was included as extra under the Ogle Brothers contract in the house account, and that building and working on this was done along up to and including a date in April, 1915. The defendants were notified that a lien was claimed on April 16, 1915. There is no evidence to the contrary. We think, therefore, that the right to the lien sufficiently appears, provided anything is justly due on the Price job. His contract continued until the work was finished. It does not appear that any of this work was merely repairs. It was rather early for repairs, and it would seem to be a gratuitous intrusion to regard any of the charges as for corrective work. We do not think, therefore, is could or should be presumed that any of these entries showing date of work on the garage were made upon either of such basis.

On the 3d day of October, 1915, Ogle Brothers made a payment to complainants of $600. At this time the defendants Ogle Brothers were indebted to complainants on several different accounts for work being variously done for them by the complainants as sub-contractors. Among such accounts was the Hobbs Flat account, older it was claimed than the Price account in controversy, and there were prehaps other accounts. The evidence showed the Price building was begun in September, 1915, and the Hobbs Flats earlier. The complainants were sub-contractors under Ogle Brothers on both these jobs, and perhaps others going on at the same time. At the time this payment was made, $500 of which was credited to the Price account, there had been charged to the Price account the sum of $696.22, though Mr. Dunn insists that in this sum there was really included some $250 more than was properly chargeable at that date, and this is one of the reasons he claims as to why a mistake was made, and that it should have been, according to his custom, pro rated on older accounts, among which was the Hobbs Flat account, claimed to be older, and to which, upon reflection, he later transferred it.

Without regard to the question as to whether there was that much due on the Price account at that time or not, and notwithstanding the efforts of Mr. Dunn to minimize the claim for consideration due this account at the particular time, the fact remains that there was that much charged by complainants against this account, and that he was needing money. And there is the further fact that this payment was made out of funds coming from Mr. Price, and it would seem, from what Mr. Ogle says in his deposition, that at

that time Mr. Price was the only available source for funds, whatever may have been the condition of the jobs on which they were needed, and the weight of the proof is, that while the complainants were not directed by Ogle Brothers to apply this money to the credit of the Price job at the time, Mr. Dunn nevertheless knew that the funds came from Mr. Price. He denies such knowledge, but Mr. Ogle testified:

"Q. I believe you stated you did not at the time you paid Mr. Dunn this $600 state to him that that was to be applied on the Price job, did you? A. No, I think not. When he came in to see me I thought he expected payment on that job, and told him I expected money from Harry Price within a few days, and supposed he would apply it to that job."

"Q. You did not expect him to apply it all on that job? A. As well as I remember I thought he would apply a part on that, and a part on something else."

"Q. You didn't expect Mr. Dunn to apply more of this $600 on the Price job than an amount sufficient to pay for the work which had been done by Weaver and Dunn on the Price job at the time? A. No, the brick work was the first work I got an estimate on."

"Q. Do you know how much work had been done by Weaver and Dunn on the Price job on October 3, 1914? A. I could not tell just what part; I got an estimate, but I don't remember what it was."

"Q. Did you get an estimate from Weaver and Dunn at that time on the Price work? A. No, not from them, but from the architect. The architect generally gives about eighty per cent of the work done."

It might be naturally inferred that the amount of the charge against the Price job at the date of the architect's estimate served to influence him, and notwithstanding his estimate may have.been more liberal than the facts warranted, 80 per cent of the $666.22 is a little the rise of $532, or nearly $533, and sufficiently covered the $500 so credited. The fact that it was so credited to the Price account is a corroborative circumstance that Mr. Dunn knew it came from Price, should be credited to his account, and therefore it was, notwithstanding a strict compliance with his alleged custom might have influenced him to apply it elsewhere, and which subsequent exigencies led him to attempt to do later.

Mr. Dunn's first explanation of how he came to apply the credit to the Price account, taken from his deposition, is as follows:

"Q. You have been asked by Mr. Hudson about the transfer of credits of the check for $600 received by you from Ogle Brothers October 3, 1914, and have stated to him that you

transferred the credit of $500 originally given to the Price job to what you have called the Hobb's Flat job; will you please state why that was done, and what change that made from the original credits given under the $600 check when you first received it? By this I mean to ask you how was the check for $600 originally applied, and why did you change it, and what did that make in your books on these two jobs? A. On receiving the $600 check, probably in a hurry to credit it to different jobs, not taking the trouble or time to see which job by right it belonged to, I directed the book keeper to credit the Price job with $500 and the Hobbs Flat job with $100. Later on, in going over my books and looking over my different accounts, I decided that there were accounts much older than that one that the money should have been credited on. After doing this and making the change, it left the Price job at that time without any credits. And by changing this credit from the account that it was originally posted on, it was credited to an old job, which was the Hobbs Flat job."

He was then asked if it was the custom of sub-contractors in this community to protect themselves under our lien laws as to crediting payments received from general contractors made to them during the progress of the work which they are undertaking for such contractors, if he knew, and if it was his own custom to make credits that way. Objection was made to this, to the effect that custom, either generally or particularly observed by others, or habituated to himself, could not affect his own right to depart from it if he saw proper, which we think was well taken; and he answered that it was the custom, so far as he knew, where open accounts are run with general contractors, that payments were credited to the oldest job on the books, and that it was his own custom to make credits that way. He was then asked:

"Q. State whether or not it was for this reason that you made the change in the credits on your books, following your discovery of the mistake to which you have referred, from the Harry Price job to the Hobbs Flat job?"

To which he replied: "A. It was."

He recurs to this in his second deposition, as follows:

"Q. Now $500 of this money was credited at the time by your book keeper at your instructions on the Price job? A. Yes sir."

"Q. State why that was done; why you instructed your book keeper to do that? A. Partly through carelessness on my part in not looking up his accounts to see which job it really belonged to, and having the Price job and the other jobs in mind—I think I had Mr. A. J. Price's contract under

way at the same time, that was Mr. Harry Price's father, and I could not say for sure I did really tell that, but judged by it being credited on the job, I presume that I did tell him to credit the Price job.''

''Q. Did you examine the books and state of your account with Ogle on the different jobs before that $500 was credited? A. No sir.''

''Q. When did you examine the books then, subsequently? A. Well, I cannot remember offhand how long it was, the jobs ran sometimes five or six months; I never rendered him a statement; we never make statements the first of the mouth, or anything like that, sometime later when I though it proper to render a statement—after we had rendered the statement in going over the accounts, I found that I had credited the wrong job.''

''Q. After you discovered that, did you correct that, or have your book keeper to correct it? A. Yes sir.''

''Q. Did you then notify Mr. A. R. Ogle of the correction? A. Not until a later date, I do not know just how long it was.''

''Q. Was that entry for $500 to the Price job on your books on October 3d a mistake or error? A. It was.''

His attention was then again directed to his custom, as follows:

''Q. What had been your custom prior to this in regard to the application of payments which he would make as to the particular job you would apply such payments? A. To the oldest job, I would say to the oldest job, or job nearest completion.''

''Q. Had that been your invariable custom or not? A. Yes sir.''

''Q. Did Mr. Ogle direct to what job you were to apply this $600 when he paid it to you? A. He did not.''

Following this his attention is directed to a statement of the state of accounts between his firm and Ogle Brothers made on the 3d day of November, a month later, in which this credit of $500 was still, and as expressly shown to Ogle Brothers, resting properly in the Price account, in the following question:

''Q. There is filed as Exhibit No. ''1'' to the deposition of A. R. Ogle what purports to be a statement, dated November 3, 1914, from Weaver and Dunn to Ogle Brothers, on which is shown, under date of October 3d, a credit to the J. Harry Price iob of $500. Was it, or not, subsequent to the time you made out this statement that you discovered the error on your books and had it changed? A. Well, it was after the statement was made, I do not know how long.''

''Q. Examine that statement, Mr. Dunn, and state why you

made out that kind of a statement, and what the occasion for it was? A. I think the reason this statement was made, Mr. Ogle having several jobs under construction, and asking him for money, he wanted a statement or memorandum of about how his account stood.''

Part of his cross-examination in relation to these matters, is as follows:

''Q. Now $500 of that check was actually entered on October 3rd as a credit to the Price job, as shown by your ledger, to which I have been referring; is that not so? A. Yes sir.''

And again:

''Q. Is it not also true, as I think you have already stated, that when you received the $600 check on October 3, 1914, you instructed your book keeper to not only enter $500 to the credit of the Price job, but also $100 to the credit of the Hobbs Flat account? A. Yes.''

''Q. So that payment of $600 on October 3rd was at that time divided by you between these two accounts as indicated by my last question? A. Yes.''

And again:

''Q. You don't mean by your testimony today to cast any doubt upon any of your previous statements to the effect that whatever your motives or reasons have been, you did in fact direct your book keeper to enter that credit of $500 on the Harry Price job on the day it was received, October 3, 1914? A. No sir.''

''Q. Nor do you mean to imply, that even though a mistake may have been made, Mr. Ogle was not in any sense responsible for that mistake, or did not cause you to do that, did he? A. No sir.''

Regarding the statement referred to as made on November 3, 1914, Mr. Ogle testified that it was, or had been, the custom of complainants to furnish them such statements from time to time, and while he supposed that it had been credited to the Price job, he knew it had been so credited as soon as he got the statement Mr. Dunn had sent him. The change of the credit to the Hobbs Flat account was not ordered by Mr. Dunn or made until about December 1st, and was actually credited to the Hobbs Flat account December 10th.

Ogle Brothers nor Price never consented to such change, nor did Ogle Brothers know of it until about the time the note was executed, and then protested against it. The firm executed the note for $600, understanding that it was on the Price job. Mr. Ogle testified that the Hobbs Flat job was a month or so older, and had been completed in the Fall, November or December.

From the foregoing we think it appears that the change of the credit from the Price account to the Hobbs Flat account was rather the result of an afterthought than to correct any mistake. The words "error or mistake" seem to have come into his examination more in the nature of suggestions from the questions than as originally designated by him, he having used the term "decided" in his original designation, implying an alteration of purpose rather than the elimination of a mistake.

We think the $500 was entered to the credit of the Price account because the money came from Price, and, therefore, should have been entered to his credit. There was not much difference in the age of the two jobs, if any, nor it seems any great disparity in the amounts due on each, and our judgment is that Mr. Dunn was sufficiently acquainted with this fact as not to require any close or critical examination of his books to determine the question of whether or not he would be doing any flagrant violence to his custom in entering this credit where it properly belonged. We think the evidence shows that he entered it knowingly and intentionally, in this instance at least without any regard to his custom, or without any thought as to which one of these accounts was the oldest or the largest. He does not even claim that he was laboring under any mistake in entering it, or that with the purpose to adhere to his custom as inviolate, and erroneously thinking or believing that the Price account was the oldest, or largest, he entered the credit under such mistaken impression; nor does he claim even that it was entered tentatively, with the purpose of correction should it be found that this rule was violated. On the contrary he gives as his reason that "on receiving the $600, probably in a hurry to credit it to different jobs, not taking the time or trouble to see which job by right it belonged to, I directed the book keeper to credit the Price job with $500, and the Hobbs Flat job with $100. Later on in going over my books I decided (rather than discovered) that there were accounts much older (meaning of course the Hobbs Flat account to which he transferred the credit) than that one, that the money should have been credited on." And thereupon he made this correction in December, a month after he submitted the credit in the statement to Ogle Brothers and the same had been knowingly acquiesced in by them.

This evidence presents no question of a mistake or error, relieving the situation from the inviolability of an executed agreement. If any mistake or error was made, it was not that induced by any misapprehension of the facts, but possibly an error or mistake in not properly considering at the time the effect of a careless disregard of his custom, which has no title to sacredness, entailing a result not anticipated, and being an error of judgment and not as

to a fact. This kind of an error or mistake cannot be reconsidered without agreement with the other fellow whose rights have been affected as a resulting consequence.

When the payment was made with funds known to come from Price, it should have been credited to the Price job, notwithstanding any custom, unless it was understood that it might be applied elsewhere, to establish which understanding custom would be a circumstance to be considered. But when a payment is made which might be devoted to different accounts, with no direction as to its application, then the payee has the right of election to devote it to such accounts as he pleases. In other words the contract in such event, effected by the payment, is to constitute in effect the payee as the agent of the payor to ratify such election, which is done the moment the election is exercised, and it thus becomes an executed agreement between the parties. In the case at bar the credit had a double ratification. After it was made and applied on October 3, 1914, on November 3d following what had thus been done was submitted to Ogle Brothers in the statement referred to, and with knowledge that the credit had been made to Price, as aforesaid, was acquiesced in as proper.

It is not material, therefore, as to what occurred thereafter, so far as the lien is concerned. These two certainly effected agreements had the effect protanto to settle the Price account and discharge the lien to that extent, and it was not within the province thereafter of Ogle Brothers and complainants to reinstate the obligation by an agreement without the consent of the owners of the property, which was not had.

In the case of Blackmore v. Granberry, 14 Pickle, 277, our Supreme Court said:

"The authorities are conflicting upon this matter of the application of payments, some of them holding that the application must be made in the interest of the creditor to the most precarious debt, as in Field v. Holland, 6 Cranch, 8; Stanford Bank v. Benedict, 15 Conn., 437. And this is the doctrine of the common law on this subject. The current of authority is to apply the rule as stated by Mr. Story. See Pickering v. Day, 95 Am. Dec., 291; White v. Nubb, 29 Am. Dec., 687; Smith v. Loyd, 37. Am. Dec., 623 and note. And this is the doctrine of the Roman or civil law in such cases, and our own authorities are in accord with this civil law rule. Bussey v. Gant, 10 Hum., 238; Mason v. Smith, 11 Lea, 67; Fulton v. Davidson, 3 Heis., 648; Lipman v. Boales, 16 Lea, 283.

"In the case of Bussey v. Gant, 10 Hum., 238, reference is made to Patterson v. Hull, 3 Cowen, 747 and note, where the cases are reviewed and many citations are made to English

cases, where as in our State, the rule of the civil law is followed. Among other cases is cited 2 Stark. Rep., 101, to the effect that payments will be applied to discharge debts for which a surety is bound, rather than to one where the debtor has given no surety, on the principal that the debtor's honor is more concerned in debts on which he has given security than in those where he alone is bound and to an old debt before a new one. L. Stark. Rep., 153.    Blackmore v. Granberry, 14 Pickle, 277, page 283.

"In that case one of the principal questions involved was as to whether a payment the application of which had not been directed by the debtor making the payment, should be applied to the relief of a surety or to an unsecured debt. It was held that it should be applied upon the secured debt for the protection and relief not only of the obligor but also of the endorser.

"In the general discussion of the law pertaining to application of payments in Vol. 30 of Cyc. on page 1246, the law is laid down as follows:

" 'While in those states where the civil law rule has been adopted the court will apply a payment to a secured rather than an unsecured debt, the general law outside of such jurisdiction is that it will be appropriated to the unsecured indebtedness.'    30 Cyc., 1246.

"This statement of the law of course applies where there has been no direction by either the payor or payee as to how the payment should be applied and no election by either. It shows, however, the strong equity that applies in favor of protecting an endorser or person secondarily liable.

"The general rule in this State, in respect to the appropriation of payments is, that a debtor owing different debts to the same person has a right to apply the payment at the time when made to either debt, and if he fails to do so, and the payment be general, the creditor may apply it, and where no appropriation is made by either party the law will apply it according to the intrinsic justice and equity of the case. Bussey v. Gant, 10 (699) Hum., 238; Fulton v. Davidson, 3 Heis., 649; Pointer v. Smith, 7 Heis., 149.

"The law is further, however that when either party has made or directed an application of a payment such application cannot thereafter be changed without the consent of both the payor and payee and especially to the detriment of a third party.

"In the case of Harding v. Wormley, 8 Baxter, 576, it appears that Harding held one note against Ward and two others against Ward and his wife, all three being endorsed by Worm-

ley. It also appeared that Mrs. Ward had mortgaged her separate property to secure the last two notes but not the first note. Mr. Ward made two payments to Harding of one thousand dollars ($1000) and five hundred dollars ($500), 'but at the time gave no direction as to which of the notes the payment should be applied.' The notes being then all due, Harding applied the payments to the note in which Ward alone was maker and entered credit upon the note accordingly, this being the note which was not secured by the mortgage and upon which the endorser Wormley had no protection standing between himself and ultimate loss by reason of his endorsement. About a week afterward, at the request of Mr. and Mrs. Ward, Harding erased the credits and entered them upon the other notes on which Mrs. Ward was joint maker with her husband. The endorsers were not informed of this change and did not assent to it. The suit was against the endorsers and the question was whether or not they were entitled to the credits that had been entered upon the note and erased.

"The Supreme Court, speaking through Mr. Justice McFarland, said:

" 'The general principal is, that the debtor has the right at the time to elect to which of the several debts the payment shall be applied, but unless he exercise this right at the time, he cannot afterward do so. Reynolds v. McFarlin, 1 Tenn., —. If the debtor fails at the time to direct the appropriation, the creditor may apply the payment. This, as a general rule, is not denied, but it is argued that the creditor and debtor may agree to change the credit and place it upon another debt. As between themselves they might, but in this case the creditor, having exercised a right which he clearly had, and entered the credit, the payment of the note to that extent was complete, and this part of the debt could not afterward be revived against the endorsers without their consent.' Harding v. Wormley, 8 Baxter, 578.

The last case, in particular, seems to be upon all fours with the case at bar.

Again:

"The exercise of the right of appropriation of payments belongs exclusively to the debtor and creditor and no third person can control or be heard for the purpose of compelling a different appropriation from that agreed upon by them. But an appropriation by either party cannot afterward be changed so as to injuriously affect the rights of third persons. 30 Cyc., 1250, citing 67 Kans., 473; 29 N. J. Eq., 119; 1 N. J. Eq., 74; 2 Fed. Cas. No. 893.

"Guarantors, sureties, indorsers, and the like. Third persons, such as grantors, sureties, indorsers and the like, secondarily liable on one of the debts, cannot control the application of a payment by either the debtor or the creditor, and neither the debtor nor the creditor need apply the payment in the manner most beneficial to such persons. So where neither party applies the payment, the court is not required to apply it so as to exonorate such third persons, although their rights will be considered. These rules are subject to the exception that where the payment, with the knowledge of the creditor, is derived from such third person, or from a fund connected with the secured debt, it must be applied thereto. Where once appropriated by either party or both to the secured debt, the application cannot be changed as against the surety. ' 30 Cyc., 1251, citing many cases.

"By the rule of the civil law the creditor was bound to make his appropriation at the time of the payment. 30 Cyc., 1238. Gass. v. Stinson, 10 Fed. Cas. No. 5, 262.

"After the creditor has made an application of a payment it cannot be altered except by mutual consent. 30 Cyc., 1238; Pearce v. Walker, 103 Ala., 250; Lane v. Jones, 79 Ala., 156; White v. Costigan, 138 Cal., 564; Hardenbergh v. Bacon, 33 Cal., 356; U. S. Rubber Co. v. Peterman, 119 Ill. App., 610; Chicago Lumber Co. v. Woods, 53 Iowa, 552, 5 N. W., 715; Metoyer v. Trezzini, 6 Rob., 124; Plummer v. Erskine, 58 Me., 59; Codman v. Armstrong, 28 Me., 91; Smith v. Wood, 1 N. J. Eq., 74; Louis v. Bauer, 33 N. Y. App. Div., 287, 53 N. Y. Sup., 985; Allen v. Culver, 3 Den., 284; Brown v. Brabham, 3 Ohio, 275; Chapman v. Com., 25 Gratt., 721; Hill v. Southerland, 1 Wash., 128; The Asiatic Prince, 108 Fed., 287, 47 C. C. A., 325.

"What constitutes an application.

"The performance of some act showing an intention to specifically appropriate the payment to a particular debt is sufficient to constitute an appropriation and it may be evidenced by circumstances as well as by express declarations. For example, an appropriation may be evidenced by . . . a statement given the debtor by the creditor . . . The mere entry of a credit on a particular account has been held not an appropriation in the absence of notice to the debtor, but when such credit is made and an account rendered to the debtor showing such application the appropriation is complete. 30 Cyc., 1237."

The foregoing is a sufficient citation of the law, we think, as guiding us to our conclusions in this cause, after settling the facts.

Assignments 1, 4, 5 and 6 are sustained.

Assignment No. 2 is sustained insofar as the same relates to the judgment rendered against the Surety Company, but overruled as it relates to Ogle Brothers.

Assignment No. 3 is likewise sustained insofar as it relates to the Chancellor's finding that there existed a lien against the Price property for the $500 in question, but insofar as the sum tendered into court might be regarded as covered by the phrase "or any other sum of money," it is overruled.

It results, therefore, that to the extent of his rendering a decree against Ogle Brothers for the sum of $500 with interest, his decree is affirmed, but insofar as the decree is against the American Surety Company of New York, involving the idea of a lien against the Price Property for the sum of $500, or any sum in excess of what was tendered and paid into court, his decree is reversed and the cause dismissed. As the money tendered and paid into court, together with the amount of cost so tendered, is the full sum that was chargeable to the Price property, no decree is rendered against either of the other defendants.

Complainants will recover of the defendants, Ogle Brothers, all the other costs of the cause, except one-half the costs in this court, which will be paid by complainants.

Portrum and Thompson, JJ., concur.