## THE MILWAUKEE BRIDGE.

(District Court, S. D. New York. August 26, 1926.)

**1. Shipping ⬤══126.**

Ship is not liable for damage to cargo after discharge into hands of Brazilian customs authorities, unless some wrongful act chargeable to vessel was cause thereof.

**2. Shipping ⬤══126.**

Vessel delivering flour damaged in part by sulphuric acid to Brazilian customs authorities *held* not at fault in failing to separate damaged from undamaged flour; such duty being that of customs officers.

**3. Negligence ⬤══62(1).**

Test in determining "proximate cause" is whether there is an unbroken connection between act complained of and injury.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Proximate Cause.]

**4. Negligence ⬤══62(1).**

Even natural and probable consequences of wrongful act or omission are not chargeable to original wrongdoer, if a sufficient independent cause intervenes between wrong and injury.

**5. Shipping ⬤══141(2, 4)—Clauses of bill of lading, if applicable, held not to exempt vessel from liability for damage from unseaworthy condition of vessel or negligence in stowage, custody, or care of cargo.**

Clauses of bill of lading exempting vessel from liability for loss from insufficiency of packages, drainage, leakage, breakage; or from stowage or contact with, or smell or taint from, other goods, if applicable, do not relieve from liability for damage resulting from unseaworthy condition of vessel, or from negligence in stowage, custody, and care of cargo.

**6. Shipping ⬤══132(5).**

In libel for damage to flour cargo from sulphuric acid, evidence *held* insufficient to show vessel unseaworthy.

**7. Shipping ⬤══138.**

In libel for damage to flour cargo from sulphuric acid, negligence, if any, in what was done after drums of acid were found to be leaking, *held* a fault in management of vessel, for which it was not liable, under Harter Act, §§ 1, 3 (Comp. St. §§ 8029, 8031).

In Admiralty. Libel by Warner Moore and another, copartners doing business under the firm name and style of Warner Moore & Co., against the steamship Milwaukee Bridge, the United States, claimant, wherein the claimant impleaded the American Trading Company and Cory Bros. & Co., Limited, and wherein the American Trading Company impleaded the Butterworth-Judson Corporation. Decree for the United States, and petitions against impleaded respondents dismissed.

See, also, 291 F. 711.

The suit is in rem against the steamship Milwaukee Bridge to recover damages to a shipment of flour caused by sulphuric acid and water, which penetrated the deck of the ship and found its way into one of her holds, where a portion of the flour was stowed. The United States of America, owner and claimant of the Milwaukee Bridge, filed petitions under rule 56, impleading the American Trading Company, shipper of the sulphuric acid, and Cory Bros. & Co., Limited, who acted as agents of the vessel in discharging the cargo of flour. The American Trading Company, in turn, filed a petition under the fifty-sixth rule, impleading the Butterworth-Judson Corporation, by which corporation the sulphuric acid was prepared for shipment and delivered to the vessel under a contract with the American Trading Company.

The steamship Milwaukee Bridge sailed on September 13, 1919, from Jersey City, bound for Newport News, St. Thomas, Pernambuco, Santos, and other ports; her final destination being Buenos Aires. At Jersey City a shipment of sulphuric acid in iron drums was loaded on the deck of the vessel. This shipment, which was made by the American Trading Company, was destined for Santos, and consisted of 73 drums, which were stowed on the after part of the forward well deck, on each side of the No. 2 hatch combing. The drums were stowed on end, one tier high, and were securely lashed with rope and wire.

The vessel, after leaving Jersey City, proceeded to Newport News, and there loaded 23,000 sacks of flour, shipped by the libelant and consigned under 14 bills of lading to various consignees at Pernambuco,

Brazil. This flour was stowed in Nos. 1, 2, and 3 holds and in the bridge deck space; approximately one-third of the shipment being stowed in No. 2 hold. The Milwaukee Bridge sailed from Newport News on September 16, 1919, and arrived at St. Thomas on September 22d. Prior to the vessel's arrival at St. Thomas, and on September 20th, it was discovered that some of the drums of acid were leaking. Thereupon the vessel's officers caused water to be played upon the drums through a hose or hoses, and jettisoned four of the drums in which leaks were actually discovered. On September 24th and again on September 27th, single drums were found leaking, and these drums were jettisoned. On September 29th two of the drums were found leaking and thrown overboard. On October 1st another drum was thrown overboard, having been found to be in a leaking condition. On this last occasion a hole was punched in the drum and the entire contents thereof allowed to run out on the deck.

The Milwaukee Bridge arrived at Pernambuco on October 4th and commenced to discharge her cargo on that date, completing the discharge on October 9th. The drums of acid were discharged upon a lighter. When they were reloaded on board the Milwaukee Bridge before her departure from Pernambuco, they were found to be in such bad condition that 14 additional drums were jettisoned as soon as the vessel was outside the harbor. The discharge of the Milwaukee Bridge was in charge of Cory Bros. & Co., Limited, the vessel's agents at Pernambuco, who employed stevedores to unload the cargo.

Delivery from the vessel was required by the laws of Brazil and the practice of the port to be made to the customs authorities, who received the cargo from the ship's tackle and thereafter had complete and exclusive custody and control thereof, being responsible under the local law for the delivery of the cargo to the various consignees.

When the hatch on No. 2 hold was removed, part of the flour in this hold was found to have been damaged by water and acid. A partial separation of some of the flour which had been damaged was made in the process of discharging the ship, but no complete separation of the sound from the damaged flour was ever made, a large number of stained bags being stowed in the customs warehouses with bags containing sound flour, all these bags being stowed in piles separated only according to marks. Delivery of the flour to the consignees was with-

held by the customs authorities, who caused an investigation to be made by the local health department, which resulted in the condemnation of the entire shipment of flour, although only a comparatively small portion thereof had been damaged. After great delay and many difficulties of procedure, this action in condemning the entire shipment was reversed, and on February 25, 1920, all but 922 sacks were released. The flour released was free from acid damage, but was infested with weevils and white worms.

The libelant seeks to recover damages to the flour by contact with acid and sea water, and such additional damages as resulted from deterioration of the flour and depreciation of its market value during the period of its detention by the authorities in Pernambuco.

Kirlin, Woolsey, Campbell, Hickox & Keating and Bigham, Englar & Jones, all of New York City (D. Roger Englar, Frank A. Bernero, Alfred Ogden, and F. Herbert Prem, all of New York City, of counsel), for libelant.

Emory R. Buckner, U. S. Atty., of New York City (William E. Collins, of New York City, of counsel), for claimant respondent.

Choate, Larocque & Mitchell, of New York City (Joseph Larocque, of New York City, of counsel), for respondent Cory Bros. & Co., Limited.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Theodore Kiendl, of New York City, of counsel), for respondent American Trading Co.

Rushmore, Bisbee & Stern, of New York City (Bruce R. Tuttle, of New York City, of counsel), for respondent Butterworth-Judson Corporation.

THACHER, District Judge (after stating the facts as above). [1, 2] There can be no recovery for damage suffered after the discharge of the cargo, unless some wrongful act chargeable to the vessel is shown to have been the proximate cause thereof. Seeking to show that the action of the local authorities in condemning the entire shipment was the natural consequence of wrongful acts chargeable to the vessel, the libelant insists that the vessel was under a duty to separate the damaged flour from the balance of the shipment before delivery to the customs authorities. The bills of lading contained the following clause:

"After goods have been delivered to the custom house or other authority in accordance with the Brazilian custom house regulations, the ship owners or agents are not responsible for any act of the custom house with

regard to the delivery either from (sic) the proper legitimate consignees or any other person."

It is shown by uncontroverted evidence that the vessel was required by the laws and usage of the port to deliver its cargo to the customs authorities, who were charged with the duty of receiving all imported goods from the ship's tackle, with caring for the same and making delivery thereof to the consignees. These officers were required by law to separate the damaged from the undamaged goods, and were in exclusive charge of placing the cargo in warehouses under their control. The vessel was not required, and it was not the practice, to notify the customs authorities of cargo damage. It had no control over the segregation of the cargo or the disposition thereof after its delivery to the customs officers. These local laws were considered in Herbst v. Asiatic Prince (D. C.) 97 F. 343, affirmed 108 F. 287, 47 C. C. A. 325, and it was there held that upon delivery to the Brazilian customs authorities the ship is relieved of further responsibility for delivery of the cargo, obviously, it may be added, because the vessel's control over the cargo ceases upon such delivery.

Under these circumstances, and particularly in view of the express provisions of the bills of lading, the vessel was not at fault in failing to separate the damaged from the undamaged flour. It had no duty, nor any power, to make such a separation. The facts disclose that the representatives of the vessel did more than they were obligated to do to prevent confusion of damaged with undamaged goods. The condition of the flour in No. 2 hold was, upon discovery, called to the attention of the customs officer in charge of the unloading. No flour was taken from No. 2 hatch until much of the undamaged flour had been discharged. The customs officers were afforded ample opportunity to ascertain the condition of the cargo before its discharge, and since all of the damage occurred in No. 2 hold there was in the very process of discharge a separation of the flour taken from this hold from undamaged flour taken from the other holds.

A substantial portion of the damaged flour (353 bags in all) was discharged in separate slings, and this lot was in fact segregated by the customs authorities in a separate warehouse. The only damaged flour which was not placed in this separate warehouse was contained in bags which were more or less stained with acid or sea water, and it would have been quite impossible to fairly determine, prior to discharge from the vessel, to what, if any, extent the flour in these bags had been damaged. Indeed, this was ultimately determined only by chemical analysis of samples taken from the bags. The stains were, however, quite obvious upon casual inspection, and, had the customs authorities desired to segregate the flour which showed any evidence of contact with acid or water, they could easily have done so by placing the stained bags in separate piles in the customs warehouse. This it was their duty to do, and it was only through their neglect of this duty that there was any confusion of damaged with undamaged goods.

The reason given for the condemnation of the entire shipment, the great mass of which was conceded to be uncontaminated, was the failure to make this separation, and it must be assumed that, if the separation had been made, the flour undamaged by contact with acid or water would have been promptly released upon inspection.

[3, 4] It is quite impossible to find any causal connection between any act for which the vessel was responsible and the condemnation of undamaged flour. The test in determining proximate cause is whether there is an unbroken connection between act and injury. The injury must be the natural and probable consequence of a wrongful act, not the result of some new and independent cause intervening between the wrong and the injury. Even the natural and probable consequences of a wrongful act or omission are not chargeable to the original wrongdoer, if there is a sufficient independent cause operating between the wrong and the injury. Milwaukee, etc., Ry. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256; Muller v. Globe & Rutgers Fire Ins. Co., 246 F. 759, 159 C. C. A. 61. The condemnation of the entire shipment was not the natural or probable consequence of damage to a very small part thereof, and whatever damage was incurred after the discharge of the flour resulted, not from any wrongful act or neglect chargeable to the vessel, but from the independent and intervening action of the local authorities.

[5] The case is thus reduced to a claim for damage to cargo prior to discharge. The claimant relies upon clauses in the bill of lading which exempt the vessel from loss or damage arising "from fault or insufficiency of packages or other insufficiently protected property * * * from drainage, leakage, breakage * * * from stowage or contact with, or smell, or evaporation, or taint, from other goods." If applicable, these clauses do not exempt from liability for damage resulting from the unseaworthy condition of the

vessel, or from negligence in the stowage, custody, and care of the cargo. The C Lopez y Lopez (C. C. A.) 297 F. 457; The Isla de Panay (C. C. A.) 292 F. 723, 727, affirmed 267 U. S. 260, 45 S. Ct. 269, 69 L. Ed. 603.

[6] It is insisted that the vessel was not seaworthy, and that there was negligence in the care of the cargo after the drums of sulphuric acid were found to be leaking. There is little more than suggestion to support the claim of unseaworthiness. One witness testified that, when repairs were made, some leaky rivets were found which had not been affected by acid; but in the survey which the witness signed before the repairs were made it was only recommended that rivets damaged by acid be renewed. Where such work is done, other rivets previously tight may become loosened and are then renewed or caulked, as required. This, I believe, explains the reference to rivets which were renewed, although not damaged by acid.

The vessel was a new ship, having completed but one other voyage. Her officers and men who had observed the condition of the hold where the damage occurred, under circumstances which would have disclosed any leaky condition of the deck plates testified that there were no leaks. The suggestion that the master was inexperienced and incompetent finds its only basis in his refusal to state his age. He held an unlimited master's license for any ocean and was shown to have had at least 12 years' experience at sea prior to the voyage in question. Under these circumstances, the claim that the vessel was not seaworthy must be rejected.

[7] The vessel being seaworthy, the claimant contends that, if there was any fault in what was done when the drums of sulphuric acid were found to be leaking, this was not a fault or failure in proper loading, stowage, custody, care, or proper delivery of cargo within the first section of the Harter Act,[1] but was a fault or error in navigation, or in the management of the vessel, within the third section of that act, for the consequences of which neither the vessel nor her owners are liable.

The drums of sulphuric acid were carefully and properly stowed on deck, being securely lashed and properly dunnaged, and the only serious charge of fault or negligence is in connection with what was done after the leaks were discovered, when the vessel was on the high seas. When this discovery was made, the danger which threatened the ship was the destruction of her deck through the corrosive effect of the acid upon her deck plates and rivets. What was done to avoid this danger

was primarily for the benefit of the ship, namely, to protect her deck from injury. Incidentally, of course, the preservation of the deck was necessary to preserve the cargo. The situation may be compared to the repair of a hatch cover broken in a storm at sea. Surely this would be within the meaning of the words "navigation or management of the vessel," as used in the third section of the Harter Act.[2] In The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241, the court said that the words "navigation or management of the vessel" include at the least control during the voyage of everything with which the vessel is equipped for the purpose of protecting her and her cargo against the inroads of the seas, and it was held that neglect in failing to close iron covers on ports, through which water came in and damaged a cargo of sugar, was a fault or error in the navigation or in the management of the ship.

Here the claim of fault is failure to jettison all of the drums of sulphuric acid after the leaks were discovered and the use of water in an effort to wash away the acid, it being claimed that the effect of this was to greatly increase the corrosive action of the acid upon the deck. Thus the fault complained of was not in the stowage, custody, or care of the sulphuric acid, all of which, it is said, should have been thrown overboard in order to prevent the corrosive action of the acid upon the deck. Had there been any fault in stowage or care of the drums containing the acid, which might have caused them to leak, the case would perhaps require a different conclusion; but the only claim of fault is in connection with what was done or left undone after the leaks were discovered. What was then done was done with the primary purpose of benefiting the ship, namely, for the protection and preservation of her deck. The cargo was only injured because these efforts failed and the acid was allowed to penetrate the deck itself. In such cases the primary nature and object of the acts which cause the loss determine which section of the statute is to govern. The Germanic, 196 U. S. 589, 598, 25 S. Ct. 317, 49 L. Ed. 610.

If there was negligence, which must be shown to avoid the clauses in the bill of lading, the fault was in the management of the vessel. For such negligence the vessel is not liable, and the libel must accordingly be dismissed, with costs.

In its brief the libelant asserts no claim against the American Trading Company or the Butterworth-Judson Corporation, but, on the contrary, concurs in the contentions made in the briefs submitted in behalf of these im-

---

[1] Comp. St. § 8029.

[2] Comp. St. § 8031.

pleaded respondents. Nor has any liability been shown on the part of Cory Bros. & Co., Limited. Accordingly the petitions against the three impleaded respondents will also be dismissed, with costs.